UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 11-259 |
| v. | : | |
| ANDREW RAMOS, | : | FILED |
| Defendant. | : | AUG 3 0 2011 |
| | | Clerk, U.S. District & Bankruptcy Courts for the District of Columbia |

### STATEMENT OF THE OFFENSES

The parties in this case, the United States of America and the defendant, Andrew Ramos, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offenses; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offenses to which he is pleading guilty.

### FACTS RELATING TO COUNT 1

1. On Tuesday, March 2, 2010, Metropolitan Police Department Detective Timothy Palchak was acting in an undercover capacity as part of a multi-jurisdictional FBI/MPD Child Exploitation Task Force. Detective Palchak ("UC") was operating out of a satellite office in Washington, D.C. At approximately 5:03 p.m., the UC was monitoring individuals in a predicated teen chat room designed for children ages 13-19. Based on the UC's experience and information gathered from other sources, this chat room is frequented by individuals that have a sexual interest in children. The UC posted a message in the chat room identifying himself as a "no limit incest dad" in the Washington, D.C. metropolitan area. An individual using the screen name/display name of "andy" sent the UC a private message stating that he was a 19 year-old into "young." The UC provided "Andy" – who was later identified as the defendant, Andrew Ramos – with his Yahoo

screen name and invited him to chat privately via Yahoo instant messenger. The defendant subsequently requested to add the UC as a Yahoo friend (commonly referred to as a "Yahoo buddy"), after which the UC added the defendant's Yahoo screen name – "akr187" – to his buddy list and began chatting online with the defendant, who also maintained an email account of akr187@yahoo.com.

2. During the course of the nearly 45-minute online chat, the defendant identified himself as a 24-year-old male residing in Fairfax, Virginia, and expressed an interest in children ages 13–16. During the online conversation, the UC told the defendant that he was sexually active with his girlfriend's 11-year-old daughter. The defendant responded, "[N]ice . . . wish [I] could watch," and asked if the UC had any pictures of the purported child. When the UC electronically transmitted to the defendant a clothed picture of the purported child, the defendant replied, "[C]ute . . . got n e underware [sic] shots?" The UC advised the defendant that the purported child lives in Virginia, but is dropped off at the UC's home in Washington, D.C. The defendant responded, "[H]ot . . . would love to watch . . . when[']s she over next?" When asked if his interest was limited to the UC and not the female child, the defendant responded, "[I] wanna hook up with her," and specifically noted that he wanted to "eat out her pussy and stick my cock in it." The defendant also asked the UC, "[S]o her cherry is popped?" The defendant thereafter made arrangements to meet the UC and purported child on Friday, March 5, 2010.

3. During a subsequent online chat conversation on March 3, 2010, the defendant asked the UC to send more pictures of the purported child and asked if the UC had a web "cam" – "so [I] can see her on it lol." When asked by the UC if he was serious about meeting on Friday, March 5, 2010, the defendant responded, "[I] do, just nervous [sic] about it." On March 4, 2010, the

2

defendant asked during another online chat, "[S]o we on for tom[orrow]?" During the same chat, the defendant later asked, "[S]he will be there tom[orrow]?" – to which the UC responded affirmatively, and the defendant replied, "[C]ool," and asked whether the UC could bring the purported child with him to the meet location. The defendant and the UC thereafter agreed to meet in one location and then meet the purported child in the lobby of a second location. The defendant again requested an additional picture of the purported child, asking "[A]nd you don't have a swimsuit pic of her or anything?" – to which the UC responded that he did not.

4. The defendant did not appear at the designated time or pre-arranged location on March 5, 2010, later telling the UC that he became nervous.

5. Between January 27 and February 14, 2011, the defendant and the UC engaged in numerous additional online chat conversations relating to the purported child – whom the UC advised was "12 now turning 13 later this year." During these online exchanges, the defendant and the UC again discussed meeting for purposes of engaging in sexual acts with the purported child. On multiple occasions, the defendant and the UC agreed to meet first alone and without the child, in order to establish that neither was affiliated with law enforcement, and then to have the child come over a day or two later, or later that same evening. In discussing the purported child during an online chat on February 9, 2011, the UC inquired of the defendant as to whether the purported child's age of 12 was "too young" – to which the defendant replied, "[N]ever said she was to[o] young," and then asked "[C]an I watch you guys start first?" The defendant also stated that he would need to first observe the purported child perform a sexual act on the UC, after which he would "join in." The defendant also inquired whether he could vaginally penetrate the purported child, asking the UC, "[F]ucking her cunt ok?" During a subsequent chat, the defendant reiterated, "[I] want to fuck her

3

. . . just want to meet you alone first." The planned meetings between the defendant and the UC during this time-frame did not occur.

6.    On March 15, 2011, at approximately 4:51 p.m., the defendant and the UC again engaged in an online chat conversation, during which the defendant again agreed to meet the UC at a pre-arranged location at 6:00 p.m. that same day, in order to prove to each other that neither worked for the police. The defendant then made arrangements with the UC to engage in sexual acts with the purported child on Wednesday, March 16, 2011. When asked by the UC if he was still interested in the purported child "once we prove that we are cool," the defendant responded, "Yea."

7.    On March 15, 2011, at approximately 5:55 p.m., the defendant was arrested at the pre-arranged location without incident. The defendant possessed a Virginia driver's license bearing the name "Andrew Ramos." The defendant waived his Miranda rights and provided a statement, during which he admitted to making arrangements via Yahoo Messenger to have sex with the purported child. The defendant further admitted to possessing images of child pornography on media devices at his home in Landover, Maryland. The defendant further admitted to frequenting the teen chat room in which he and the UC first met, and noted that he had falsely represented his age as 19-years-old on other occasions in that chat room.

### FACTS RELATING TO COUNT 2

8.    In February 2011, the defendant engaged in an online chat conversation with R.E., an actual 12-year-old child, who the defendant met in the same predicated teen chat room in which he met the UC on March 2, 2010.

4

9. Although the defendant initially told R.E. that he was a young teenager (age 13, 14 or 15), the defendant subsequently sent R.E. a picture of himself, at which point R.E. realized that the defendant was an adult.

10. The defendant and R.E. started to engage in a normal chat conversation through Yahoo! Instant Messenger, through which R.E. knew the defendant by his Yahoo online screen name of "akr187" – which is the same screen name that the defendant used in his online chats with the UC. During one of their online chat conversations, the defendant suggested to R.E. that they meet. The defendant told R.E. that he had a lot of money and offered to give R.E. $50 if the child sucked his penis. The defendant and R.E. agreed to meet at the Potomac Mills Mall in Woodbridge, Virginia, where R.E. would suck the defendant's penis for $50. The defendant subsequently told R.E. that $50 was too much money and asked R.E. to stand-up naked and masturbate for him on a webcam. R.E. complied with the defendant's request.

11. On a Sunday afternoon in February 2011, the defendant traveled from his home in Landover, Maryland to meet R.E. as planned at the Potomac Mills Mall in Woodbridge, Virginia. The defendant and R.E. communicated via text message on their cell phones in order to find each other at the mall, during which they agreed to meet in the bathroom, with each going into a separate bathroom stall prior to meeting. While situated in separate stalls in the bathroom, R.E. sent the defendant a text message indicating that he could not go through with the planned sexual act. The defendant subsequently left the bathroom, after which R.E. exited about five minutes later.

12. A short while later, the defendant sent R.E. another text message asking the child if he still wanted the money. R.E. responded yes and agreed to meet the defendant, after which they met and the defendant gave R.E. the money and then touched and rubbed R.E.'s buttocks on top of

his jeans for approximately two seconds. The defendant asked R.E. if he ever wanted to talk again and R.E. responded no, after which R.E. did not talk to the defendant ever again.

**FACTS RELATING TO COUNT 3**

13. On March 16, 2011, members of law enforcement executed a search of the defendant's residence in Landover, Maryland, pursuant to a consent form executed by the defendant following his arrest on March 15, 2011. During the course of the search of the residence, law enforcement recovered, among other items, a MAC laptop (S/N CD2F8242DF8V); a MAC laptop (apart in pieces) (S/N W85300DXSQ5); a Fujitsu hard-drive 120GB (S/N K439T7828SSA); and a white iPod 40GB (S/N JQ446TEERSQ).

14. Pursuant to the consent previously provided by the defendant, law enforcement conducted a forensic review of the digital evidence – specifically, the computer and computer media that was recovered from the defendant's residence in Landover, Maryland, as well as a black Motorola cellular telephone that was recovered from the defendant incident to his arrest.

15. A forensic review of the white iPod 40GB (S/N JQ446TEERSQ) revealed the presence of 75 videos of child pornography. The majority of the child pornography depicted prepubescent male and female children engaged in sexual acts with each other and/or adults, including video depictions in which the male children are being anally penetrated and/or engaged in oral sex, and in which the female children are being anally penetrated, vaginally penetrated and/or engaged in oral sex.

16. A forensic review of the MAC laptop (S/N CD2F8242DF8V); the MAC laptop (apart in pieces) (S/N W85300DXSQ5); the Fujitsu hard-drive 120GB (S/N K439T7828SSA); and the black Motorola cellular telephone indicated that they had been used or intended to be used to commit or to promote the commission of the offenses to which the defendant is entering a guilty plea.

DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offenses and have discussed it with my attorney, Pamela Satterfield, Esq. I fully understand this Statement of the Offenses. I agree and acknowledge by my signature that this Statement of the Offenses is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offenses fully.

Date: 8/15/11

Andrew Ramos
Defendant

ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offenses, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offenses as true and accurate.

Date: 8/15/11

Pamela Satterfield, Esq.
Attorney for Defendant Andrew Ramos